JFM:JAG
F.#2008R01486

**M09-0876**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | COMPLAINT AND AFFIDAVIT |
| | IN SUPPORT OF APPLICATION |
| - against - | FOR ARREST WARRANT |
| PHILIP BARRY, | (15 U.S.C. §§ 78j(b) & 78ff) |
| Defendant. | |

- - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        MARK J. PETRUZZI, being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"), duly appointed according to law and acting

as such.

        Upon information and belief, there is probable cause to

believe that in or about and between January 1978 and

February 2009, both dates being approximate and inclusive, within

the Eastern District of New York and elsewhere, defendant PHILIP

BARRY did knowingly and willfully (i) employ a device, scheme,

and artifice to defraud; (ii) make untrue statements of material

fact and omissions of material fact necessary in order to make

statements made, in the light of the circumstances under which

they were made, not misleading; and (iii) engage in acts,

practices, and courses of business which would and did operate as

a fraud and deceit upon persons, directly and indirectly, by use of the means and instrumentalities of interstate commerce and in connection with the purchase and sale of securities.

(Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.)

The source of your deponent's information and the grounds for his belief are as follows:

I.    Background

1.    I have been a Special Agent with the FBI for approximately 10 years.  The facts set forth in this complaint and affidavit are based on my interviews of investors and information obtained from the review of documents, including witness reports prepared by other agents.  In the portions of this complaint and affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated.

2.    Because I submit this complaint and affidavit for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth all facts known to me about this investigation and case.

2

II.   The Defendant and the Leverage Group

      3.   The defendant PHILIP BARRY resides in Brooklyn, New York, and he has maintained a business office at 477 82nd Street, Brooklyn, New York, 11209.

      4.   In or about 1978, BARRY created Leverage Option Management Company, Inc. for the purpose of accepting money from individuals who were seeking a return on investment.  BARRY used the money to purportedly operate an investment fund that eventually became known as the Leverage Group, the Leverage Group Funds, and/or North American Financial Services (collectively, "the Leverage Group").[1]

    A.   The Leverage Group's Investments

      5.   BARRY told most investors that the Leverage Group invested only in stock options.  In reality, however, BARRY did not limit the Leverage Group's investments to stock options. Indeed, BARRY eventually stopped investing in stock options altogether and instead invested in real estate mostly located in Sullivan County, New York.[2]

---

[1] Since January 1978, BARRY has created and maintained control over a number of other entities, including Leverage Management LLC, Philip Barry LLC, Barry Publications, and Saint Josephs Development Corporation.

[2] In a February 5, 2009 letter to investors, BARRY revealed that his real estate holdings are "the only assets held by or for the benefit of the [Leverage] Group's investors — no other assets exist."

3

B.    Guaranteed Annual Rate of Return

6.    BARRY promised investors high rates of return that purportedly would be generated by investing in stock options. Specifically, in December of each year, BARRY would determine a "guaranteed" annual positive rate of return for the following year.  For example, BARRY guaranteed a rate of return of 21.00% for 1979, 16.00% for 1984, and 12.55% for 2002.  These positive "rates of return," however, were not the result of any investment activity.  Rather, they simply represented pre-determined interest rates made up by BARRY.

C.    Account Statements

7.    BARRY issued account statements to investors that reported materially and fraudulently inflated account balances. The statements were not generated by any software tied to the Leverage Group's investment accounts, but rather were produced by hand using a word processor.  These fraudulent account statements were intended to encourage investors to continue investing in the Leverage Group.

8.    BARRY would typically mail account statements on a quarterly basis.  Each initial account statement would show the amount of money invested (the "opening deposit"), the rate of return (the pre-determined "guaranteed effective annual yield"),

4

and the resulting "closing balance."[3]  These account statements
were fraudulent in a number of respects.  For example:

       a.   They suggested to investors that the Leverage
Group had in fact earned the rate of return indicated on the
account statement.  In reality, as indicated above, the rate of
return was not earned from any investment activity.

       b.   The account statement "closing balances" did
not represent the amount of funds in the investors' accounts.
Rather, they simply represented the result of multiplying the
amount the investors had paid by BARRY's pre-determined
"guaranteed effective annual yield."  Indeed, as of
February 2009, the total of these "closing balances" greatly
exceeded the amount of the Leverage Group's assets.

       c.   On some account statements, BARRY falsely
said that the Leverage Group had purchased specified stocks on
behalf of investors.

   D.   <u>Risk of Loss</u>

      9.   BARRY misled investors as to their risk of loss,
routinely representing that investing in the Leverage Group was
safe.  For example, in December 2002, BARRY distributed a letter
stating as follows:

_____

[3] The opening deposit or balance for subsequent account
statements would equal the prior quarter's closing balance.

5

WE ARE NOW ENTERING OUR 25TH YEAR OF
PROVIDING THE MEMBERS OF THE LEVERAGE GROUP
WITH HIGH YIELDS AND A 100% RECORD OF SAFETY
OF PRINCIPAL THROUGHOUT SOME OF THE MOST
TURBULENT TIMES OUR NATION AND ITS FINANCIAL
MARKETS HAVE EVER SEEN.  WE HAVE ALWAYS
BELIEVED THAT IT IS PRUDENT TO EXPECT THE
UNEXPECTED WHEN PROTECTING ASSETS, AND THIS
PHILOSOPHY HAS SERVED US WELL IN TIMES WHEN
MANY FAMOUS NAMES AND LARGE INSTITUTIONS HAVE
FAILED THEIR CLIENTS AND FALLEN INTO
DISREPUTE.  WE WILL CONTINUE TO ADHERE TO OUR
PROVEN PRACTICES AND IMPROVE UPON THEM
WHEREVER POSSIBLE IN OUR SECOND QUARTER-
CENTURY SO THAT WE CAN CONTINUE TO BE THE
ABSOLUTE SAFEST PLACE FOR YOUR MONEY TO
CONTINUE TO GROW.

10.  As another example, BARRY included the following

statement on some of the investors' quarterly account statements:

FOR YOUR PROTECTION: ALL INVESTED ASSETS ARE
INSURED BY THE FEDERAL GOVERNMENT SPONSORED
SECURITIES INVESTORS PROTECTION CORPORATION,
(S.I.P.C.) AGAINST FAILURE FOR UP TO
$500,000.00 PER ACCOUNT.

11.  BARRY's representations to investors regarding the

Securities Investors Protection Corporation ("SIPC") were — at

best — highly misleading.  SIPC is a federally mandated non-

profit corporation that protects securities investors from

financial harm if a brokerage firm fails.  The Leverage Group,

however, is not a brokerage firm.  To the extent BARRY deposited

Leverage Group funds into a brokerage account, SIPC protection

would apply only to the Leverage Group account maintained with

the brokerage firm, not to the hundreds of individual client

accounts maintained by the Leverage Group.  BARRY's statement —

6

with its "for your protection" reference — was clearly designed
to suggest to individual investors that in the event of loss, the
investors could each recover up to $500,000 from SIPC.  No such
SIPC protection existed.

     E.   <u>Withdrawals</u>

     12.  BARRY promised investors that they could easily
withdraw money from their accounts.  For example, in a
February 5, 2007 letter to one investor, BARRY wrote that
"[w]ithdrawals can be made at any time with two to three weeks
notice."  These assurances helped induce initial investments and
subsequent investments.  BARRY routinely broke this promise.

     13.  When investors expressed interest in withdrawing
from their accounts, BARRY would first discourage such
withdrawals.  If investors nonetheless insisted on making the
withdrawals, BARRY would not comply with the requests in a timely
fashion, and would make excuses for not doing so.[4]  Once BARRY
issued a withdrawal check, he often instructed investors to wait
a period of time before depositing or cashing the check.  Even
when investors followed BARRY's instruction, the checks would
often be returned due to insufficient funds.  In some cases,
BARRY ignored investors' withdrawal requests altogether.

---

    [4] On or about October 14, 2001, BARRY provided an investor
with a written receipt of a $185,000 investment in the Leverage
Group.  After signing his name on the receipt, BARRY wrote "I
don't believe in excuses."

F.    Correspondence and Promotional Materials

14.   BARRY made materially false and fraudulent representations in correspondence and promotional materials that were sent to existing and potential investors.  For example, in a March 10, 2006 letter, BARRY wrote that the Leverage Group "has produced annual returns ranging from the recent 12.55% to a high of 21% back in 1979."  Such statements were false because the positive rates of returns cited by BARRY were not "produced" or earned.  Rather, they were simply BARRY's pre-determined fabrications.

III. Victim Interviews

15.   During the course of the investigation, the government has interviewed numerous individuals who were victims of the defendant PHILIP BARRY's scheme.  Although the details vary from person to person, the victims' stories are essentially the same.  Each invested money with BARRY because he guaranteed an annual positive rate of return, promised that their investments would be safe, and said that withdrawals could be made easily.  These victims also reported that they later had great difficulty withdrawing funds from their accounts.  In many cases, victims succeeded in obtaining checks from BARRY, but the checks bounced.  Numerous victims reported losing substantial amounts of money.

A.   Victim #1

16.   Victim #1 was introduced to BARRY by a friend during a social event in 2002.   The friend had previously invested in the Leverage Group.   BARRY told Victim #1, among other things, that he used to consult with "the Bush, Sr., White House" on matters of economic policy, and that he operated a successful investment fund.   Victim #1 eventually invested a total of $156,500 in the Leverage Group.   On or about February 5, 2009, Victim #1 learned that the Leverage Group had no funds when she received the letter referenced in footnote two above.[5]

B.   Victims #2 and #3

17.   Victims #2 and #3 (a married couple) met BARRY in 2005.   They were impressed by the Leverage Group's 12.55% annual return, which BARRY said was earned from stock option investments.   BARRY also informed Victims #2 and #3 that withdrawals could be made at any time, so long as they provided two to three weeks notice.

18.   Victims #2 and #3 eventually invested $500,000 in the Leverage Group, based in part on quarterly statements showing that the fund was in fact earning 12.55% per year.   Victims #2 and #3 later decided to liquidate their entire account.   Despite

---

[5] BARRY also convinced Victim #1 to invest $125,000 in real estate that BARRY owned.   Victim #1 has not received any return on that investment, and BARRY has not repaid any portion of her investment.

repeated efforts to withdraw all of their funds, BARRY has only paid them approximately $26,500.[6]

C.   Victim #4

19.   Victim #4 learned about BARRY in 2006, when a friend (an existing Leverage Group investor) told Victim #4 about the Leverage Group's 12.55% annual return.   Victim #4, a 70-year-old widow who resides in California, telephoned BARRY and they discussed her interest in investing in the Leverage Group.   BARRY told Victim #4 that the Leverage Group invested in stock options, and that she would earn 12.55% interest on any money that Victim #4 sent to him.   Relying on this guarantee, Victim #4 mailed BARRY $175,000, which represented her life savings.[7]

20.   In December 2007, Victim #4 requested that BARRY send her back a portion of her investment.   BARRY told Victim #4 that he would send the money in a few days.   After she received no money, Victim #4 telephoned BARRY but was told only that she should wait.   After receiving multiple checks that bounced, Victim #4 eventually received two good checks totaling $10,000.

---

[6] In late 2007, Victim #3 inquired as to the safety of money invested in the Leverage Group.   BARRY assured Victim #3 that investments in the fund were safe; he explained that the Leverage Group would be the "last man standing" if there was a downturn in the economy because the fund was diversified and was invested in things such as gold.   Victim #3 and his wife thought that the Leverage Group invested only in stock options.

[7] Victim #4 also referred her friends to BARRY; one friend invested $100,000.

D.    Victims #5 and #6

21.    Victims #5 and #6 (an elderly married couple) are
retired factory workers.  They first invested with the Leverage
Group in 2004 or 2005 after being referred to BARRY by an
existing Leverage Group investor.  Victims #5 and #6 decided to
invest with the Leverage Group because BARRY guaranteed a 12.55%
rate of return and promised no risk of loss.  After Victims #5
and #6 received quarterly statements indicating that they were
indeed earning 12.55% interest, they decided to invest more
funds.  Over time, they gave $50,000 to BARRY.

22.    In or about late 2006, Victims #5 and #6 moved
into a retirement home.  Around that time, they sought to
withdraw money from their Leverage Group account.  BARRY issued
dozens of checks to Victims #5 and #6, but the checks bounced.
When Victims #5 and #6 — who are Italian immigrants and speak
little English — would question BARRY regarding their inability
to withdraw their money, BARRY would make excuses as to why he
was unable to pay them.

23.    The son of Victims #5 and #6 eventually confronted
BARRY about his parents' difficulties in obtaining their money,
and specifically asked BARRY whether he was paying existing
investors with money obtained from new investors.  BARRY admitted
that he was in fact doing so.

11

24.   Victims #5 and #6 eventually succeeded in obtaining approximately $25,000 from BARRY.  The remainder of their $50,000 is yet to be recovered.

E.   Victim #7

25.   Victim #7 learned about BARRY in 2000, when an existing Leverage Group investor told Victim #7 about the Leverage Group's successful performance.  Victim #7 met with BARRY at his office.  During that meeting, BARRY told Victim #7 that he would invest Victim #7's money in options, that she would earn a return on her investment of at least 12.50%, and that she could withdraw her money at any time.  Based on these representations, Victim #7 invested a significant amount of money with the Leverage Group.

26.   In early 2008, Victim #7 attempted to liquidate her entire Leverage Group account.  When BARRY failed to comply with the liquidation request, Victim #7 threatened to report BARRY to the United States Securities and Exchange Commission.  At one point, BARRY told Victim #7 that if all of BARRY's investors sought to withdraw their money, he would commit suicide or "wind up in prison."

IV.  Defendant's Admissions

27.   On August 1, 2008, the defendant PHILIP BARRY visited the United States Attorney's Office for the Eastern District of New York, and asked to speak with a prosecutor.

12

Shortly thereafter, BARRY was interviewed by an assistant United States attorney and an FBI special agent. Before the start of the interview, BARRY was told, among other things, that (1) he was not obligated to speak with the government, (2) he could end the interview at any time, and (3) he could choose to first secure the assistance of an attorney. BARRY said he understood these warnings, and that he was proceeding voluntarily.[8]

28. During the course of the interview, BARRY admitted, among other things, that the Leverage Group is invested mainly in real estate mostly located in Sullivan County, New York, and not in stock options. He explained that he began purchasing real estate in the 1980s, and has tried to get approvals from local authorities to develop the land. BARRY said that although he tried for seven years to obtain such approvals, he was unsuccessful.

29. BARRY also told the government that he owes investors a total of approximately $50 million, and he admitted that in the past he made payments to Leverage Group investors in part by using "new money" — i.e., money obtained from new investors.[9]

_____

[8] Another assistant United States attorney was present for this meeting, but he stayed for only the first 15 minutes.

[9] In another conversation with the government on October 7, 2008, BARRY again admitted that he made payments to investors not from successful investments in stock options, but rather from money received from new investors. On February 2, 2009, BARRY

V.   Conclusion

30.   Based on my experience and the results of the government's ongoing investigation, it is clear that the defendant PHILIP BARRY has been operating a classic Ponzi scheme, whereby BARRY has been paying returns to Leverage Group investors not from any actual profit earned on BARRY's investments, but rather from existing investors' deposits or money paid by new investors.   Over the years, he has used whatever excess monies he has received not to invest in stock options, but rather to purchase real estate and, to a lesser extent, for other purposes.

31.   From in or about and between January 1978 and February 2009, BARRY's scheme induced approximately 800 individuals to collectively give BARRY more than $40 million. While many investors succeeded over the years in making full or partial withdrawals (particularly before the scheme began to unravel), numerous other investors have sustained substantial losses.

---

was asked under oath, in connection with his bankruptcy filing, to identify the amount of money investors paid since 2003, and how BARRY used that money.   BARRY estimated that he received $10 million during that time period, and he admitted that "most of the funds were used for payments to investors."

32.     Although the investigation is ongoing, a preliminary estimate of the cumulative total balance of the Leverage Group investors' accounts is more than $45 million.[10] These amounts far exceed the actual value of the assets held by the Leverage Group during that same period of time.[11]

33.     Given the confidential nature of this continuing investigation, I respectfully request that this complaint and affidavit be maintained under seal until this court or another court of competent jurisdiction orders otherwise, except that

---

[10] Indeed, as noted above, BARRY has told the government that he owes investors approximately $50 million.  In addition, on December 1, 2008, BARRY was asked under oath, in connection with his bankruptcy filing, to state the Leverage Group's "liability" to investors.  BARRY's estimate was $60 million.

[11] As noted above, BARRY over the years used Leverage Group funds to purchase real estate.  The government has identified approximately 60 properties in which BARRY or one of his corporate entities maintains a current ownership interest, and we have obtained relatively recent title searches and appraisals for 20 of them.  Although the combined value of these properties is approximately $9 million, the amount available to BARRY upon sale of these properties would be substantially lower than $9 million because (1) BARRY does not hold clear title to any of the 20 properties; (2) the properties were obtained through mortgages, or were used to secure other loans (indeed, 19 of the 20 properties are in foreclosure); (3) there are numerous unpaid tax assessments associated with many of the properties; and (4) other encumbrances exist.  The approximately 40 other properties have a combined estimated market value of slightly more than $1 million, according to available tax assessor records.  These properties are subject to the same obstructions to clear title indicated above.  During BARRY's December 1, 2008 bankruptcy testimony, he was questioned about the value of his Sullivan County real estate.  Consistent with the government's estimation, BARRY said the value of the property was "somewhere between two and ten million."

15

Special Agents of the FBI may disclose this complaint and affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendant.

WHEREFORE, your deponent respectfully requests that the defendant PHILIP BARRY be dealt with according to law.

MARK J. PETRUZZI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of September, 2009

dge
k